IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 28, 2021 Session

## JULIE C. W. v. FRANK MITCHELL W. JR.[1]

**Appeal from the Circuit Court for Davidson County**
**No. 13D-1587      Philip E. Smith, Judge**

_____

### No. M2019-01243-COA-R3-CV

_____

This appeal arises from a divorce. Julie C. W. ("Wife") sued Frank Mitchell W. Jr. ("Husband") for divorce in the Circuit Court for Davidson County ("the Trial Court"). After a trial, the Trial Court divided the marital estate, set child support and alimony, and entered a parenting plan. Wife appeals, raising a number of issues. In one issue, Wife argues that the Trial Court placed inordinate weight on the fact that Husband is 16 years older than her in awarding him roughly 59% of the marital estate, even though his earning power is substantially greater than hers. We agree. We vacate the Trial Court's division of the marital estate and remand for a new and equitable division that is as close to a 50/50 division as possible, based upon the specific facts of this case. However, on all other issues, we discern no reversible error by the Trial Court. We thus affirm, in part, and vacate, in part, the Trial Court's judgment, and remand for further proceedings consistent with this Opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed, in Part, and Vacated, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, J., joined. KRISTI M. DAVIS, J., filed a separate concurring opinion.

Helen Sfikas Rogers, Siew-Ling Shea, and Lawrence J. Kamm, Nashville, Tennessee, for the appellant, Julie C. W.

Gregory D. Smith and Brenton H. Lankford, Nashville, Tennessee, for the appellee, Frank Mitchell W., Jr.

---

[1] Given the sensitive subject matter regarding one of the parties' children, we decline to use the parties' full last names.

# OPINION

## Background

Husband and Wife married in 2003, and resided in Nashville, Tennessee. At the beginning of trial in this matter, Husband was age 60 and Wife was on the cusp of 44. Husband has two children from a prior marriage—Sophie, age 21 at trial, and Sam, 18. Husband and Wife have two children from their marriage—Callie, age 14 at trial, and Andrew, 10. Both Husband and Wife are attorneys who work at the law firm of Bass, Berry & Sims ("BBS"). Husband is a partner at the firm, whereas Wife is a part-time hourly staff attorney. The parties' disparity in income underlies most of the disputed issues in this case.

In May 2013, Wife sued Husband for divorce in the Trial Court; a year later, she filed an amended and supplemental complaint. Several attempts at mediation failed. In April 2014, Husband filed a motion for pendente lite and summer parenting time. Wife alleged in her response that Husband inappropriately bathed in front of the children. At a May 2014 hearing on the motion, the Trial Court reacted negatively to Wife's assertions, stating: "[T]o me that's the worst thing a parent can do is inappropriately accuse someone of impropriety." Wife cites these remarks as evidence that the Trial Court was predisposed to find her a non-credible witness at trial. In July 2014, the Trial Court entered an order granting Husband parenting time Thursday to Sunday on alternating weeks, Thursday overnight on the off week, equal time during the summer, and designated holidays. After the pendente lite hearing, Wife obtained new counsel. Following a period of inactivity in the case, Wife hired new counsel, her third. In February 2016, Wife filed a motion to modify the scheduling order, which was denied. That same month, Husband filed an answer and counterclaim to Wife's supplemental complaint for divorce. In April 2016, Wife filed a motion for partial summary judgment seeking an order that the parties' antenuptial agreement terminated during the marriage. In May 2016, Husband filed his own motion for partial summary judgment seeking to find the antenuptial agreement valid. In August 2016, the Trial Court ruled in Wife's favor in the dueling motions for partial summary judgment.[2]

As the case proceeded, issues arose with discovery. Wife filed a motion for Rule 37 sanctions due to Husband's failure to produce discovery materials. Ultimately, Husband's counsel paid Wife more than $23,000 in attorney's fees and other sanctions.

Trial occurred over the course of 11 days spread out over several months, from January 2018 through July 2018. We now review the pertinent testimony from this lengthy

---

[2] The Trial Court's decision as to the antenuptial agreement is not an issue on appeal.

trial. Wife, then age 43, testified. Wife met Husband at their mutual workplace, BBS. Wife, a Vanderbilt law school graduate, was on a partnership track at the firm. Regarding Husband's two children from a prior marriage, Sophie and Sam, Wife testified: "I had a lot of parenting responsibility for them when they were over because my husband liked to play golf on the weekends, and he liked to get some rest as well, working full-time. So I spent a great deal of time with them." Wife testified that she continued to work full-time after she married Husband, and she was responsible for cooking and cleaning. Callie was soon born, later followed by Andrew. At one point, Wife told Husband she was struggling with her responsibilities. According to Wife, Husband reacted with anger. Nevertheless, Wife moved to a part-time schedule at the firm. Wife testified:

> I also was continuing to earn partnership credit under that arrangement and worked those two days until I took a leave of absence in 2011, a two-year leave of absence which would be the time until Andrew started kindergarten. And then after those two years, I returned to Bass, Berry & Sims, and I told them I could work more hours than I had been working previously, and they said that they would no longer offer me partnership credit for my work, that I would be a staff attorney.

When Wife took her leave of absence in 2011, Wife and Husband opened a joint checking account. Continuing her testimony, Wife stated that Husband had a bad temper and spanked the children. Wife testified: "There are many instances of him losing his temper. The other instance of him injuring would be when Callie was eight years old and he got upset with her, and he grabbed her by the arm and jerked her hard enough to leave bruises on her arm." However, Wife testified that Husband never hit her. When Wife married Husband in 2003, she was earning $90,000 per year. Wife testified that if she were to resume working full-time today, she would not be paid a salary but rather "they would calculate it as 1,500 billable hours per year, times my current billable rate would come out to 192,000 a year."

When Wife and Husband separated in 2012, Wife moved to a house in Bellevue, where she lived for two years. In August 2014, Wife rented a house her father purchased and owned in the Green Hills area. Wife pays her father $3,431.35 a month in rent. Wife testified that she and Husband filed joint tax returns over the years. Husband prepared the returns. In 2017, Wife's income was $153,293.95. With respect to the parties' assets, Wife asked for an equal share in Husband's main retirement account. At the time the parties were married, Husband had some $600,000 in his retirement account. For her part, Wife had $31,000. Wife accumulated $275,290 since then. Asked about her claims that Husband engaged in dissipation by spending on his children from a prior marriage, Wife stated:

-3-

Q. … Sophie's 529 has somehow increased, either through deposits or appreciation, $93,000 while your husband paid out of your joint accounts $88,000; correct?

A. That's right. He has been paying the Baylor expenses out of our joint checking account, and the statements didn't show any payments out of the 529 plan. And I know that in December of 2016 that he made a $14,000 contribution.

Q. To --

A. Sophie's 529 plan.

Q. Now, your children have how much in their 529 plans?

A. There's two for Callie. He maintains one that has a balance of $158,373. And I maintain one for Callie that has $50,378.88.

Q. And then how much does Andrew have?

A. Andrew has $121,712.

Q. And how much does your stepson Samuel -- what grade is Samuel in?

A. He's a junior in high school.

Q. How much does he have in his account?

A. $257,372.

Q. So just slightly more than his sister who is a junior in college?

A. Right.

Q. Did your husband ever give you any reason why he would be paying tuition out of the marital estate when he had a quarter of a million dollars for a junior at Baylor?

A. We haven't discussed it.

Wife testified that the parties' daughter Callie, an eighth-grader, was interested in boarding school. Wife stated that Callie suffers from anxiety and obsessive-compulsive disorder. Wife stated further that Callie is obsessed with her health and injuries. Wife testified that, in her view, it was in her children's best interest to have only 80 days per year with Husband. Wife stated that she needed more than the baseline $3,200 to raise the children. Wife asked for an upward deviation of $1,000 per month in child support. Wife explained: "That's to maintain the lifestyle that they have had up through the marriage, where they're used to taking nice vacations, they're used to being in private schools, they're used to having the clothes, and they're used to doing the extracurricular activities." Wife asked that Husband pay all of the children's healthcare expenses rather than a pro rata 90% share, stating: "He is currently carrying a health insurance plan that covers all of his children. So there would be no additional expense for him to continue to carry these two." Wife also requested more money for Callie and Andrew's 529 plans to fund the cost of private college education.

On cross-examination, Wife was asked about her assertions that Husband was

uncooperative.  Wife testified:

> Q. And that's what you said in that summary, that father repeatedly refused to allow the children to participate in sports if they involved time on Thursdays, unless mother agrees to change the judge's pendente lite residential schedule to give him more parenting time?
> A. That's right.
> Q. So look at the first email that you've got there.
> A. Yes.
> Q. Is there anything in that first email on July the 27th, 2014, in which he has refused to allow the children to attend gymnastics, unless the judge changes the residential schedule?
> A. No.
> Q. In fact, he says here on July the 27th of 2014 "Tuesday and Friday gymnastics are fine.  I'm happy to help with driving to soccer.  If there's a regular time you want me to drive, let me know.  I will get Callie to her soccer camp this week.  I'm not sure what you want me to do about the swimming invitation."  And then he says, "Once the school schedule starts, I plan on keeping Thursday evenings activity free, unless something is required for school."  Right?
> A. Yes.
> Q. Now, there is nothing threatening or bad spirited about that, is there?
> A. There is nothing threatening about that, no.

***

> Q. That's when the first emails were sent and when he first started saying "We're not going to have them involved during the school year in sporting activities on Thursday nights"; correct?
> A. On Thursday nights.  Prior to that, he objected to Andrew's soccer practices on Wednesday nights, when Wednesday was his night.
> Q. Okay.  All right.  Fair enough.  So, Ms. [W.], you're comfortable with your statement on the top of that page "Father does not support children's sporting activities and interests"?  Is that a true or a false statement?
> A. I would say it's not always true or not always false.
> Q. Well, you made the statement.  So is it sometimes false?
> A. Yes, on -- with respect to his objections to their activities on Thursdays and also prior to that, when it was Wednesdays.

Callie, then age 13, testified.  Callie stated that her father had an anger issue.  Callie testified further that she once saw her father hit her mother, even though Wife herself stated

that Husband never hit her. Callie stated that her father makes her feel "guilty."

Wife later resumed her testimony, and the questions turned toward finances. Wife testified that she spent $41,504.19 on maintenance and repairs at the house she was living in. Wife stated it was her hope that she could purchase the home from her father once the divorce was over. Wife was then asked about her income. After some discussion about what Wife could potentially earn, Wife's counsel stated: "This is not an issue … She's capable of doing 192-, yes. That's why we put on that proof. We're not hiding it." The Trial Court asked Wife about her claimed expenses:

> THE COURT: I understand what Mr. Smith is asking you on the $1,818.23 and the $1,000 for home goods for you and for the children. Now, looking down at the footnote at the bottom, 3, this includes furnishings, electronics, bedding, decor, office supplies. I understand those. But then we have lightbulbs, tools, cleaners, toiletries, and medicines. Well, one, we have a separate category for medicine; medical and dental out of pocket. Then I look up at the food category at the top, 956 for you and 1,037 for two children. I have to say, in nine years I've been on the bench, I have never seen food expenses near that high. How do you spend almost $2,000 a month on food?
> THE WITNESS: That's from eating out and from going to the grocery store.
> THE COURT: Okay. Well, $2,000 a month?
> THE WITNESS: Yes, sir.
> THE COURT: Do you not have a category for recreation or entertainment on here?
> THE WITNESS: Yes, I do. It's down below toward the bottom.
> THE COURT: But, you know, part of the food I usually see in groceries would certainly include the cost for cleaners, toiletries, medicines, lightbulbs, maybe some office supplies. I mean, when you talk about the home goods, the home maintenance, you're kicking that up with food for both you and the children at $2,000 a month. I'm going on Mr. Smith's math. But that's right around $5,800 a month. Is it your testimony under oath -- and this is a real important question. Is it your testimony under oath that these expenses are accurate?
> THE WITNESS: Well, I think that the split -- see, what happened is, like I said, I gave -- the split among the categories may not be exact because it's hard to tell when they look at, say, a credit card bill from Target how much of that was spent on food and how much was spent on home goods. So we just tried to do our best in allocating to the different categories. You know, if I did shopping at a place that -- like Home Depot, is it home goods or home maintenance? So we just tried to allocate as accurately as we could in those

instances like --

THE COURT: I understand. But that's really not answering my question. When you and [Husband] were living together were you spending $2,000 a month on food?

THE WITNESS: I think we were. With the other two kids and -- yeah, I think that we -- this is consistent with how much -- I mean, when the kids were little, they didn't eat as much. But they each eat almost as much as I do now.

THE COURT: Okay. Well, I'm just -- in nine years -- and I've tried a lot of divorces -- I have never seen a food expense approaching $2,000. Very rarely do I see it over $1,000.

Wife stated that her home expenses and maintenance cost $3,800 per month, and had for the past two years. According to her statement, Wife's total household expenses were $23,311 per month including children's expenses, which averaged $11,338 per month. Wife asked for $10,000 per month in alimony for ten years, stating that there were additional childcare expenses she needed to have covered were she to resume working full-time.

At this stage, Wife attempted to put on Vic Alexander ("Alexander"), CPA, to testify that Sophie and Sam's 529 accounts were "grossly overfunded" and Callie and Andrew's "barely are funded." However, Alexander was not allowed to testify on this subject. The following exchange occurred between the Trial Court and Wife's counsel:

THE COURT: Because [Husband] spends money on a child more than another child, that's dissipation? Do you have any authority for your position on that?

MS. ROGERS: No, because this is pretty unusual, Your Honor. It is pretty unusual for someone to overfund beyond what a child needs to get through college when they're not court ordered to do it and to spend marital money instead of the 529 -- the whole purpose of the 529 is to pay for college -- and then he's writing those checks out of the joint account….

***

THE COURT: I understand exactly what you're saying, but I am going to tell you and I'm going to make the finding, based on what you have told me, I do not believe Mr. Alexander's testimony will substantially assist me as the trier of fact, and so therefore there is no need for me to hear this testimony. If you would like to make an offer of proof, I will step off at this point.

-7-

Alexander's testimony and report were made as an offer of proof.

Dr. Jay Woodman ("Dr. Woodman"), a clinical psychologist in Tennessee since 1986, testified as well. Dr. Woodman had seen Callie around 90 times since 2012. Dr. Woodman stated that Callie "has an anxiety disorder, and she certainly has some obsessive tendencies which is under the rubric of the generalized anxiety that she has. As well as, you know, she has a trend toward detail and perfectionism." Dr. Woodman testified that Callie prefers her mother overall, although not necessarily to the detriment of her father.

Alexander returned to the stand to testify. Alexander stated that BBS's equity was over $24,000,000. Husband's 2.0432% interest in BBS as of April 30, 2017 had a value of $503,567. At the time the parties married in 2003, Husband's ownership percentage of 2.19%, and equity of $10,813,679, yielded $236,820. Thus, there was an increase in value in the interest of $267,000. Alexander used a "fair value" analysis, without applying any discounts. Alexander stated that if discounts were applied, a 32% reduction would be appropriate. Alexander explained why he did not apply discounts: "Because what the value represents is, in my opinion, is earned but undistributed income. The value resides or is a result of receivables and work in process which within 120 days will be converted to cash." Alexander stated that BBS has a very high collection rate. Continuing his testimony, Alexander stated that Husband had withdrawn an unaccounted-for $127,522 from the parties' joint accounts over a two-year period during the divorce.

Alexander was asked about his criticism of the report made by Tom Price ("Price"), CPA, husband's expert, in which Price put a large emphasis on the age disparity in the parties to favor more assets to Husband:

> So what I state in my report is that Mr. Price is promoting a legal theory that equitable division would provide equal benefits to both parties at retirement. When Mr. Price did his calculation and his analysis, he only considered the marital portion of [Husband]'s retirement in doing his computations. He did not consider the separate portion of the retirement account of $676,658 at all. He is projecting the value of the retirement asset into the future based on certain life expectancy assumptions and growth assumptions, and reducing the supposed value in the future to present value instead of dividing the present value of the retirement asset as of the date as near or reasonably possible to the final divorce hearing date. Mr. Price assumes that [Wife] will continue to accumulate monies in her portion of the retirement account for another 16 years, meaning he assumes that she will have no need to withdraw these monies for any other purpose, and he assumes an annual investment return of 6 percent on her portion of the retirement money with no explanation as to how he arrived at the 6 percent number. And it's that return

number, when compared to what he uses as his discount rate of 2 percent, that helps create the difference in value because of the 16 years. Mr. Price further assumes that the effective tax rate for [Husband]'s projected retirement withdrawals of $204,000, is what he had projected, is 25 percent, and that he applied that same tax rate to [Wife]'s projected retirement withdrawals of 518 when under our current tax law those would not have the same tax rate. The tax rate for the 518 would actually be 31.13 percent. So the inappropriate tax rate application causes [Wife]'s after tax benefit to be overstated. So there's an assumption that she won't make any withdrawals. There's an assumption that her tax rate will be a lower rate than what it would actually be under today's law. And there's an assumption that she's going to earn 6 percent on her retirement monies.

Alexander testified that, as of the day of trial, Husband's interest in BBS had declined to 1.6423%. Alexander stated that he was unaware of Husband having any managerial role at BBS. The firm is governed by a managing partner and an executive committee. Alexander stated that Husband cannot sell his 1.6423% interest in the firm, and, apart from regular distributions, the interest would only be realized were the firm to dissolve. With respect to the $127,000 in withdrawals by Husband at issue, Alexander stated that he had no evidence it was used for a purpose unrelated to the marriage.

At the close of Wife's proof, Husband moved the Trial Court to involuntarily dismiss certain of Wife's claims: Wife's dissipation claims, Wife's claim to a share in the increase of Husband's BBS interest over the marriage, Wife's claim regarding the Fidelity Account being her separate property, whether Wife carried her burden to justify an award of child support beyond the guideline amount of $3,200, and Wife's request for the establishment of educational trusts. The following exchange occurred:

THE COURT: But you have to show that was wasteful spending. Did this $127,000 go to girlfriends? Did it go to trips with girlfriends? Did it go to things of that nature? That's your burden.
MS. ROGERS: And, Your Honor, we found out for the first time during my client's cross-examination that they were claiming that those were hers, or could be hers. That was the reason for the subpoena. I think if --
THE COURT: When the discovery deadline is closed, Ms. Rogers, it's closed, and I'm not going to open it up. That's not fair to the other side.
MS. ROGERS: I understand that's your ruling.
THE COURT: I would not let Mr. Smith do that. I would not let him do that; I'm not going to let you do that.
MS. ROGERS: I understand that's your ruling, Your Honor. I'm moving on. What I wanted to tell you is that I think if the Court does not require the

husband to put some proof on, what happens to $127,000 is that this statutory injunction is meaningless. Because it does require, in Subsection B, "Each party will maintain records of all expenditures." He hasn't.

THE COURT: But how are those enforced?

MS. ROGERS: He has none.

THE COURT: But how are those injunctions enforced?

MS. ROGERS: With the contempt.

THE COURT: With the contempt.

MS. ROGERS: If you're telling me I haven't waived my right to bring a criminal contempt against him, I guess I haven't waived that right at this point, and I'll get those records for that purpose. But that's where we are.

THE COURT: Well, I don't think you waive the right to a criminal contempt, but I don't think it will do -- I mean, we're on this motion right now.

MS. ROGERS: I understand. That's why I'm moving forward.

The Trial Court granted Husband's motions to dismiss. In an October 2018 order reflecting these rulings, the Trial Court stated, in part:

[Husband] has been paying out of his earnings for his daughter from a previous marriage to attend Baylor University….The Court finds that parties should be encouraged to send children from other relationships or previous relationships to college. It may have been an ill-conceived notion on the part of [Husband] to pay this out of his earnings, but this Court cannot say that the education of this child paid out of his earnings is wasteful.

7. Additionally, [Wife] has alleged that the unaccounted for withdrawals out of a joint account or an account into which marital funds were deposited constitute dissipation by [Husband].

The Court finds that [Wife] has again failed to establish that these unaccounted for withdrawals allegedly made by [Husband] were for a wasteful purpose. In fact, no purpose was established. [Wife]'s position is that she has established all of these unaccounted for withdrawals and that she has no idea what they were for, and so it must be dissipation.

***

8. Except as it relates to the funds spent on [Husband]'s paramour which was approximately $2,800.00, the Court grants [Husband]'s Motion to Dismiss pursuant to 41.02(2) on this claim.

9. [Wife]'s second claim is that the increase in value of [Husband]'s interest in Bass, Berry & Sims is due to substantial contribution that she has made to that increase.

-10-

The proof is established that the percentage share of [Husband]'s interest during the marriage has actually decreased while the value has increased….It is also undisputed that [Husband]'s ownership interest at the time of the marriage and divorce has decreased from 2.19% to 2.0432%. Again, however, the value of [Husband]'s interest has increased from the time of the marriage when it was $236,820.00 to $503,567.00 at the time of the divorce hearing.  That is an increase of $267,000.00.

\*\*\*

12. The Court cannot determine why the equity value of [Husband]'s increase in Bass, Berry & Sims has increased.  It may be due to his income increasing but it could also be due to the income of either one or more partners with Bass, Berry & Sims.  Without knowing what caused the increase in the equity value, the court cannot determine whether [Husband] made a significant contribution to the increase in the value of the equity interest.  Each party is charged with making a substantial contribution to the preservation or increase.

While this Court does not in any way mean to demean the job that [Wife] has done with the children or with the home, the law is the law.  [Wife] has failed to carry her burden, and therefore, the Motion for Involuntary Dismissal on this claim is granted.

\*\*\*

14. The next issue is whether [Wife] carried her burden of proof to justify an award of support beyond the Guidelines amount of $3,200.00.  The Court will acknowledge that [Husband] is an extremely high income earner.  Under the Guidelines, [Husband] is required to pay the sum of $3,200.00 per month for the children.  In addition, [Husband], through counsel, has agreed to pay private school tuition for both children.

\*\*\*

For [Wife] to be awarded an amount in addition to $3,200.00, she must, "prove by a preponderance of the evidence that more than this amount is reasonably necessary to provide for the needs of the child" or, in this case, children. (TN. COMP. R and REG. Chapter 1240-02-04-.07(g)(1)).

[Wife] has the sum of $11,388.00 as the amount that these children need on a monthly basis.  Many of these expenses, which are contemplated by the Guidelines, are extremely high, even to the point of the Court

questioning [Wife]'s credibility. For example, food for two children for one month is $1,037.00. Home goods listed for the children at $1,000.00 per month. Travel and vacation of $1,090 per month. Entertainment listed at $648.00 per month. School trips of $500.00 per month. All of these items are in a sworn Income and Expense Statement which is marked as Exhibit 26.

The Guidelines Speak to "reasonable and necessary amounts" for a child or children. The amounts listed by [Wife] are not only unreasonable in the eyes of the Court, they are unbelievable. Simply stated, this Court does not believe [Wife] on those expenses.

Further, the Court finds that [Wife] has failed to carry her burden of proof that any additional expenses for the children above the $3,200.00 are "reasonably necessary."

[Husband]'s request for dismissal pursuant to Rule 41.02(2) of the Tennessee Rules of Civil Procedure is granted on this ground.

15. The final issue is whether [Wife] has established a basis for the Court to establish an educational trust. In the case of Nash v. Mulle, 846 SW2d 803, 807-808 (Tenn. 1993), the Supreme Court stated, "when a non-custodial parent has shown normal parental concern for a child, a trust fund may be unnecessary to ensure that his or her feelings are reflected in spending. However, when a non-custodial, parent shows a lack of care, the court may step in and require the parent to support his or her child. The establishment of this trust is simply one discretionary mechanism used in the endeavor."

The undisputed facts in this case established that [Husband] has funded a 529 account for each child with a balance of well over $100,000.00. [Husband] has agreed to pay private school tuition in the amount of $4,000.00 per month. [Husband] has evidenced an intent to this Court that he will provide for his children. He has demonstrated his willingness to support his children.

[Wife] has failed to establish a need for an educational trust. [Husband]'s Motion to Dismiss pursuant to Rule 41.02(2) is granted to this claim.

Trial resumed. Husband's expert, Price, testified to his theory of "equalizing purchasing power" based upon the age gap between the parties in supporting a larger award of marital assets to Husband:

Q. Mr. Price, you are asking the Court in this situation to -- that it is equitable for the wife to receive 35 percent of the retirement that her husband has

-12-

accumulated in this marriage. Is that your testimony today under oath? On the second page of your report, Exhibit 67.

A. Based on the January 8? That report?

Q. Yes, sir.

A. Yes. I'm saying in order to equalize the purchasing power between the two parties, that allocation of the 4.8 million dollars would be split 64 percent to [Husband] and 36 percent to [Wife].

\*\*\*

Q. Do you know of any basis, any case in Tennessee, or have you ever testified that you have to equalize future purchasing power in a retirement plan?

A. That you have to?

Q. Yes, that that's the standard.

A. I don't know the standard mentions purchasing power.

Q. Have you ever presented this methodology in any other Court in this state in all of your years of testifying?

A. Never had an age discrepancy like this in court before. But, no, I haven't.

\*\*\*

Q. Well, Mr. Price, nobody in this room needs the CPA degree that you have to know that if [Wife]'s income is under $200,000 a year and [Husband]'s is at 1.6, he's going to be contributing a whole lot more and accumulate a lot more going forward; correct?

A. It could be. Depends on how he funds his retirement.

Q. Well, it also could be that [Wife] will have a lot less depending on how she funds her retirement in the future too, doesn't it?

A. It works both ways.

Q. Yes. And it also means you have no idea, as you sit here today, what they're going to have at their retirement time because you don't know, for example, if [Wife] is going to become disabled; correct?

A. That's why I'm not speculating on what they will have when they quit. I'm projecting what they will have based on what they have right now 16 years from now and be able to benefit from 20 years forward.

Q. But you have to assume that they're never going to touch it.

A. That's correct.

Q. And, again, you don't know if [Wife] might become disabled and have to hit her retirement more quickly; correct?

A. Correct.

-13-

Husband, age 60, took the stand. Husband had worked at BBS since 1982. Husband earned a college degree from Harvard and later a law degree from Vanderbilt. Husband testified in opposition to Wife's account of the divorce:

> Well, first and foremost, my wife left me. One day when I was at work closing a transaction I was working on for a year and a half, she got a moving van, loaded up furniture, everything from the kids' rooms, and moved out. We had been having -- we had been having problems in our marriage, as was evident from that recording that she presented earlier in the trial. My view was we didn't have a marriage. There wasn't anything there. There wasn't any intimacy. There wasn't any contact. There wasn't any conversation. There wasn't any empathy. It was difficult living in a situation where I felt like that she didn't want to be with me and she didn't want to be with Sophie and Sam, my older children.

Regarding his future job plans, Husband testified that he does not like what he does, and would like to become a high school teacher. Husband testified that, despite that wish, he has not quit his job because "if I quit, the Court would still consider I was making money at the level that I was earning it at at the time I quit. And I just need to see what my obligations are before I -- before I decide to stop. But I'm 60 and a half years old, and I really want to stop." Husband testified that Wife had not acted as a homemaker to him for the past five and a half years. Husband acknowledged that Wife had been the primary caretaker of the children during the separation. Husband testified that he puts his earnings into two separate accounts at Pinnacle. Wife had access to these accounts during the separation, from which she paid various expenses like attorney's fees, vacations, and housing expenses. Husband requested two thirds of his retirement funds, and for Wife to receive one third. Husband testified that he wanted the Trial Court to find that Wife's rent payments constitute dissipation. Regarding the 529 accounts at issue, Husband testified:

> Q. … I want to ask you about one more topic, and that has to do with the 529 accounts that you're holding for the benefit of the children. You're the owner of those accounts; is that right?
> A. [Wife] has some that she is the holder of for Callie and Andrew. But, yes, I have one for each of the kids, each of my four kids.
> Q. And do you intend to use those 429 -- or 529 accounts for the benefit of the children?
> A. Yes.
> Q. When -- what is your expectation and intention with regard to the level of the education for each of your children?
> A. Well, my goal has always been that my kids be able to be educated to the level I am educated at without coming out with a bunch of student debt. And

[Wife] and I discussed that specifically.

Q. Is that true for all four of your children?

A. Yes.

Q. If one child completes his or her education, can that 529 money be used for another child?

A. Yes. It can be -- essentially continue to grow, invest it and be -- and grow tax free but used for the next kid.

Q. And you have agreed to pay the private school education for the two children of this marriage; is that correct?

A. That's part of my proposed parenting plan.

Q. And you don't intend to take money out of the 529 accounts for the private school; is that correct?

A. It's permitted to do so under the tax laws.

Q. It's permitted to. But do you intend to do that or to save that for college?

A. I intend to save it for college, but, you know, I mean, part of this is -- all the financial consequences attendant to the divorce I need to review.

Q. With regard to college, is there -- what is your intention if there is any money left over after the last child has completed their education? Is -- is education -- I'm talking about your youngest son, about Andrew.

A Well, I think it's highly unlikely that there is going to be any money left in any of these 529 accounts. I mean, private school tuition at the college and graduate school level is 60 or $70,000.

THE COURT: But I thought you weren't going to pay private school tuition --

THE WITNESS: I'm sorry. I'm talking about private school colleges.

THE COURT: Private colleges. Okay.

THE WITNESS: Yes, sir.

THE COURT: All right. And, again, there's the -- to use a term from the '80s, "trickle down -- "trickle-down economics." On these 529 accounts, those moneys not used by an older child can trickle down to benefit the next child in line.

THE WITNESS: And I will absolutely make that commitment.

THE COURT: Okay. All right.

On cross-examination, Husband acknowledged that he sometimes gets angry, although he denied having a "particularly bad temper." With regard to retirement age at BBS, Husband testified that "at least a couple" of lawyers at the firm are in their 80s. Husband stated: "My understanding is there is a retirement age and that if somebody is going to stay around post that, you have to get permission to do so." Husband testified that he did not know how certain BBS attorneys kept working at the firm despite the operating agreement calling for retirement of attorneys at age 70 (unless they attained the

-15-

age of 60 prior to March 1981).  Husband stated that, even if he continued working, he expected his income to go down.  Husband stated: "[M]y compensation has already been reduced for the current year.  And I think it's -- the historical practice is people near the end of their career, their compensation comes down.  I'm -- I'm trailing off of my peak earning years."  In clarification, Husband testified that he had not given notice that he was retiring; retiring from the firm was simply something he wished to do before long.  Husband testified:

Q. Well, why is it, then, that you expect [Wife] to be working 1,500 hours when she's not ever done that and last year she earned her highest income and you're working so much less?
A. So I've been doing this for 36 years.  I mean, you come to a point in your career where, you know, the clients you have are the clients you have.  You're dependent upon the transactions they do. I tend to be the head of teams of lawyers.  People don't want to pay me $900 an hour to do the first draft of a document.  [Wife] is in the middle of her career, working as a mid-level person or the second chair on transactions where her services are in incredible demand.  And when I was her age, I was billing 2,000 hours a year.  So I think the combination of where I am in my career, clients not wanting to pay a high rate for services that can be done by someone else at a much more cost-efficient level, and the fact that, you know, unless my clients are doing a particular kind of transaction that they need my particular insight and advice on, they want it done by somebody that is more cost-efficient.  And, you know, I have to recognize that that's what's in their best interest.

Husband earned in the vicinity of $1,500,000 per year.  Husband stated that it was hard to attract new clients as his clients are big companies, and they are far and few between.  Husband stated that he felt he had a good track record of working with Wife with regard to the children.  When asked why he was tardy in attending a court-ordered parenting class, Husband stated that initially he did not know about the order.  Husband was also questioned on his support for his older children:

Q. Well, the right thing that you did for your kids also, though, had the effect of taking money out of this marital estate and benefiting your two older children; correct?
A. My understanding is the money in the 529 plans is marital property.  I earned it.  And it's for Sophie's education, Sam's education, Callie's education, and Andrew's education.  And I believe the disparity is [Wife] thinks that the money for Callie and Andrew's education is fine and the money for Sophie and Sam's education is hers.
THE COURT: Is hers?  What do you mean?

-16-

MR. SMITH: That she ought to get a chunk of it. And -- and I want to educate all my children.

THE COURT: Well, let me ask you this. The two youngest children, do you plan on -- I've heard what you're saying about your two oldest children. Do you plan to educate them in the same manner? You know, if Andrew wants to go to medical school, you'll make sure that he -- that he goes, if possible? I mean --

THE WITNESS: If possible, yes. Now, there -- there is -- there's a caveat there. One, I'm old. And, two, [Wife] is going to come out of this proceeding with a substantial amount of money, and I do think it's reasonable if -- for her to think about some of that too. But, you know, the --

THE COURT: Well, but is that treating the children differently from your two older ones? The two youngest children, is that not treating them a little differently than your two older children? Because your previous spouse, I haven't heard anything about her helping out.

THE WITNESS: No. And she hasn't. But she didn't have that level of assets.

THE COURT: Okay.

THE WITNESS: I mean, she just didn't.

Wife's expert, Alexander, returned to the stand to testify in rebuttal. Alexander stated:

Q . Okay. Now, did you also look at [Husband]'s actual spending from bank accounts and credit cards and those numbers?

A. Yes.

Q. And what has his actual spending on eating out food been? And over what time period?

A. So what we did, we -- we came up with the monthly average of his spending from January 2016 through June of 2017. And during that period, the eating out amount was 2,000 -- or averaged 2,656 per month.

Q. How about travel cost? What did he spend on travel?

THE COURT: Hold on just a second. Can you give me that average eating out again? 2,000 and --

THE WITNESS: 656.

THE COURT: Okay.

***

Q. Mr. Alexander, are you familiar with 529 plans?

A. Yes.

-17-

Q. And can [Husband] redirect excess moneys from Sophie and Sam to be used for Andrew and Callie?

A. Yes. The owner of the account can take funds and add them to another account that he owns, or the owner can have them distributed ultimately.

Q. Can he spend them on anything other than educational expenses?

A. Well, not without paying tax. I mean, the owner of the account can withdraw the moneys, but the owner then has to pay tax on the earnings plus a penalty.

Q. Okay. So if there is no court order in place, he could liquidate these accounts and just pay the tax on it?

A. Well, the owner has that right.

Trial concluded, and some months passed before entry of the final decree. In February 2019, Wife filed a motion asking the Trial Court to re-open the proof based upon a serious incident involving Callie. The Trial Court declined to re-open the proof.

In March 2019, the Trial Court entered its Memorandum and Final Decree of Divorce. Among its rulings, the Trial Court designated Wife primary residential parent of Callie and Andrew, with 221 days of parenting time to Husband's 144. The Trial Court also found that Wife had stipulated to an imputed income of $192,750 per year, and that Husband's income for 2017 was $1,668,000. Out of a total marital estate of $10,928,629.72, the Trial Court awarded Husband $6,494,278.34 and Wife $4,434,351.38, for a split of about 59.4% for Husband and 40.6% for Wife. Husband was to pay 90% of uninsured medical expenses for the children. The Trial Court awarded Wife $5,000 per month in transitional alimony for 48 months. In its decree, the Trial Court found, in part:

[witness credibility]

[Wife]'s statement of the children's future needs as set forth in her sworn income and expense statement, is unbelievable.

[Wife]'s cross examination by [Husband]'s counsel, while polite and professional, was devastating. [Wife] admitted that many, if not most, of the allegations she set forth in her trial brief either were speculative or simply not accurate. [Wife] wants to limit [Husband]'s parenting time and set forth allegations she believes justify her position. [Wife] failed miserably to prove [Husband] has abused the children in any way. At times, it appeared to the Court that [Wife] was attempting to destroy [Husband]'s relationship with Callie and Andrew. Making these allegations without proving them further, has seriously damaged the Court's confidence in [Wife]'s truthfulness.

The Court finds no basis to give any weight to [Wife]'s testimony.

The Court finds that the [sic] Callie [W.]'s testimony also was

-18-

problematic. Callie clearly established that many of her injuries and bruises were accidental, despite [Wife]'s suggestions otherwise. Callie testified that she witnessed [Husband] physically assault [Wife]. This testimony was blatantly false. [Wife] herself testified that [Husband] had never physically assaulted or abused her.

The Court finds that Callie was not truthful with the Court. The Court further finds that Callie appears to be manipulative and will stop at nothing to get her way. The Court gives no weight to Callie's testimony.

***

The next witness to testify was Tom Price. Mr. Price's testimony substantially assisted the Court. Mr. Price testified that the methodology he used to determine the value of [Husband]'s capital account, and the value of his interest in Bass Berry & Sims, was "fair market value," and that this methodology is consistent with Internal Revenue Ruling 59-60.

The Court finds that Mr. Price's testimony regarding the value of [Husband]'s interest in Bass Berry & Sims, as well as how the value increased, makes more sense to the Court than Mr. Alexander's testimony. The Court acknowledges that Mr. Alexander's testimony helps the Court understand how [Husband]'s share is valued. The Court gives greater weight to Mr. Price's testimony as it relates to the actual value of [Husband]'s interest in Bass Berry & Sims.

***

[division of the marital estate]
Each party has accused the other of dissipating marital assets. [Wife] argues [Husband]'s "over-funding" of his older children's 529 accounts, and paying for many of Sophie's college expenses from their joint account, as well as paying for Sophie's living expenses, constitutes dissipation. Unwilling to find spending on one's children and their educations to be "wasteful," the Court found this spending does not constitute dissipation. [Husband] conceded, however, to dissipating approximately $5,000 on paramours after the parties' separation.

***

[Husband] has asked the Court to consider their age difference in awarding [Husband] a larger share of the marital estate. [Wife] points to their income disparity as the reason why she should receive more. The Court

is somewhat persuaded by [Husband]'s argument that he should receive a greater share of the parties' retirement assets — though not necessarily to the degree [Husband] wishes. No matter how you look at it, [Husband] will retire before [Wife] does, and he will be drawing down, rather than contributing to, his retirement funds. Further, these funds are tax-deferred, and [Husband] will have to pay taxes when he begins to withdraw them. As such, they are not a dollar-for-dollar equivalent to the parties' non-retirement assets. Based on these considerations, the Court believes [Husband] should receive a larger share of the parties' retirement assets. The Court will offset this award, however, by awarding [Wife] a larger share of the parties' non-retirement "liquid" assets. [Wife] may then spend or invest any or all of that money as she sees fit.

***

[alimony]

[Wife] is receiving more than $4.4 million of the marital estate, with nearly $2 million of that in non-tax-deferred cash accounts. For reasons previously explained, the Court awarded the majority of the tax-deferred accounts to [Husband]. Any award of alimony *in solido* necessarily would come from [Husband]'s share of the marital estate. Instead of making a separate award of alimony *in solido*, the Court simply divided the marital estate appropriately and equitably based on the factors set forth in the statute. The Court finds that, based on [Wife]'s earning ability, the Court's division of marital property, and the transitional alimony award discussed below, an award of alimony *in solido* is inappropriate. [Wife]'s request for alimony *in solido* is denied.

***

The Court finds many of [Wife]'s claimed expenses are unreasonable at best, and outrageous at worst. But the Court believes it can discern a clearer picture of [Wife]'s financial need by reducing some of her expenses to a reasonable amount and, in some instances, eliminating them altogether.

[Husband] has agreed to pay Callie and Andrew's private school tuition until they graduate from high school. His agreement is incorporated into the Permanent Parenting Plan, and is now the order of the Court. This eliminates [Wife]'s listed $4,000 per month for tuition from her expense statement. [Wife] included $560 per month for "Recreation (Sports"). But [Husband] has agreed to pay up to $600 per month, on top of his regular child support obligation for the children's extracurricular activities, eliminating

-20-

that $560 per month from her expenses. The Court finds that $1,000 per month is an appropriate amount for [Wife] to spend for food for herself and the children, which eliminates an additional $1,037 per month in expenses. The Court believes that $800 per month is a reasonable amount to spend for their clothing, and $600 per month is a reasonable amount for "home goods." The Court believes it is reasonable to plan for $900 per month for travel and vacation. The Court further believes that the $200 per month [Wife] has listed for attorneys' fees should be eliminated from her statement. [Wife] already has used marital funds to pay more than $400,000 in her attorneys' fees prior to trial. The Court will address the issue of any remaining attorneys' fees later in this Memorandum and Final Decree.

The Court finds that [Wife]'s reasonable monthly expenses are $14,321.73. This figure is significantly lower than the inflated amount of $23,311 [Wife] submitted to the Court. The Court must base its alimony award on reasonable expenses, and not on an outrageous wish list.

Before setting alimony, the Court also must consider [Wife]'s income. [Wife] claimed monthly income of $11,779 in her sworn income and expense statement. At trial, however, she stipulated, that she can earn $192,750 per year, or $16,062.50 per month. The Court recognizes this is a gross monthly amount, and that her net income will be lower after taxes and other deductions are taken from her pay.

The Court has reviewed the factors set forth in Tenn. Code Ann. § 36-5-121 and previously found that [Wife] needs transitional alimony and that [Husband] is able to pay. If these were the only two factors for the Court to consider, the Court's job would be much easier. But the Court also must consider the parties' standard of living during their marriage. The alimony statutes and appellate court opinions on the subject do not provide a bright-line formula for quantifying a couple's standard of living. Instead, the Court must rely on its experience, knowledge of the law and an abundance of common sense to do so. In this case, the Court has noted that the parties led a very nice lifestyle, but compared to their income, it was by no means extravagant. They lived in a very nice, though relatively modest home (again, relative to their income); they drive modest cars; they send their children to private schools; they've saved a substantial amount of money. The Court heard no testimony whatsoever that either party spends lavishly.

The Court also considers the fact that [Wife] has been "adjusting to the economic consequences of establishing and maintaining her own household..." for six years. *See Gonsewski* at 115 (noting that wife "received *pendente lite* spousal support... for 16 months prior to the divorce hearing" in affirming the trial court's decision to deny wife transitional alimony).

After considering the factors set forth under Tenn. Code Ann. § 36-

[5]-121, the Court finds that [Wife] is entitled to transitional alimony in the amount of $5,000 per month for 48 months, or until [Wife]'s death or remarriage or [Husband]'s death, whichever occurs first. This award of transitional alimony is non-modifiable and shall begin on the 15th day of the month following the entry of this Memorandum and Final Decree of Divorce, and shall be payable on the 15th day of every month thereafter, subject to the limitations set forth above.

(Footnote omitted). Both parties filed motions to alter or amend. At a June 2019 hearing, the Trial Court explained why it had earlier declined to grant Wife's request to re-open the proof. The Trial Court stated:

THE COURT: And I will state on the record why I'm not reopening the proof. This was an eleven-day trial. Yes, it took an extraordinarily long amount of time. It took a long period of time for me to get this order ready. However, I am not prepared to take the blame on this.

This case was set for five days. It went eleven. And every time I would have an open date, somebody had some conflict. And so it drug out for a number of months, but that wasn't because of me. I had dates. And I'm not going to take the blame for scheduling conflicts.

Yes, it took me, what, four, five months to get this order out. It is a 117-page order. It is the most thorough order that has ever come out of this court since I have been on the bench. I've got recurring dockets. I had other cases under advisement. And we worked very hard on this order.

So I understand what everybody's position is on updating and everything else, but you folks signed a stipulation. Exhibit 5. No one, neither side, made a motion to update anything on that stipulation or to file an amended stipulation. You could have done that, and I would have probably allowed that. However, since there was that stipulation that was introduced as Exhibit 5, we go to the case of --

Yes, I went a little old-school. And for you young lawyers, this is what we call a reporter (indicating).

-- the case of Overstreet vs. Shoney's. It is a June 4, 1999, case out of the Court of Appeals. The perm. app. was denied on October 4, 1999. And what it basically says is I'm bound by that stipulation.

And I will tell you -- tell this side of the table -- Mr. Lankford, it's error for me to accept proof that disputes that stipulation. Everybody is bound by that stipulation.

The way I read it is -- and the way look at it is this is like an admission to a disputed issue. Once it's admitted, it's admitted, and there's no -- there's no proof necessary. Again, this could have been cured by a simple motion

-22-

to either submit more updated proof before the close of the proof, or it could be that you just file a motion to amend the stipulation, and I would accept that.

In June 2019, the Trial Court entered its final order in which it corrected certain mathematical and typographical errors but otherwise declined to alter or amend its memorandum opinion. Wife timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Wife raises the following issues on appeal: 1) whether the Trial Court erred in declining Wife's request, made after trial but before entry of the final decree, to re-open proof in the matter stemming from Callie's serious incident; 2) whether the Trial Court erred in its division of assets; 3) whether the Trial Court erred in its award of child support; and, 4) whether the Trial Court erred in declining to award Wife alimony in solido and in the amount and duration of its transitional alimony award to Wife. Husband raises the separate issue of whether Wife's brief should be stricken pursuant to Rule 9 of the Rules of the Tennessee Court of Appeals for what he describes as its disrespectful tone and content toward him and the Trial Judge.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding witness credibility, our Supreme Court has stated:

When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *see also Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). In order for evidence to be clear and convincing, it must eliminate any "serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 221 (Tenn. 2009)). Whether the evidence is clear and convincing is a

question of law that appellate courts review de novo without a presumption of correctness. *Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 515 (Tenn. 2013), (citing *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010)), *cert. denied*, ⸺ U.S. ⸺, 134 S.Ct. 224, 187 L.Ed.2d 167 (2013).

*Kelly v. Kelly*, 445 S.W.3d 685, 692-93 (Tenn. 2014). Insofar as the issues on appeal implicate the abuse of discretion standard, "[a]n abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011).

The first issue we address is Husband's as to whether Wife's brief should be stricken pursuant to Rule 9 of the Rules of the Tennessee Court of Appeals for what he describes as its disrespectful tone and content toward him and the Trial Judge. Husband requests his attorney's fees in connection with this issue. Rule 9 provides: "Any brief or written argument containing language showing disrespect or contempt for any court of Tennessee will be stricken from the files, and this Court will take such further action relative thereto as it may deem proper." Husband points to several statements in Wife's principal brief as examples of her disrespect, a few of which are as follows:

"What is illogical to Mother is that the Trial Court – in which all things domestic are centered around the best interest of children – declined to re-open the proof, mostly because to do so would have been too much work and the parties had already had their day in court."

"At the inception of this hearing, Mother's counsel first asked the Trial Court to make the facsimile transmission denying Mother's motion to re-open proof an exhibit…. The Trial Court declined to do so, and instead told the parties – in very narcissistic fashion – how the Court had turned out 'the most thorough order that has ever come out of this court since I have been on the bench.'"

"To Mother, it was illogical for the Trial Court to put its own interests ahead of the best interest of a minor child."

"If this matter is remanded, Mother respectfully requests that it be remanded to a less busy Court - one that has time to perform its functions properly; a Court that is more interested in getting things right, instead of just getting them written."

Husband is correct that Wife's statements and insinuations about the Trial Judge are deeply disrespectful. It is mind-boggling that Wife and her attorneys would think these statements would be well-received by this Court. Wife's disrespectful statements about the Trial Judge are neither amusing nor accurate. They do not assist this Court in resolving a single issue on appeal. Wife's disrespect toward the Trial Judge serves only to mar her otherwise sound brief. These statements are utterly gratuitous, and inexplicably personal. There is no justification for that type of tone toward a judge in an appellate brief; no contextualization lessens its inappropriateness.

Nevertheless, instead of filing a motion to strike Wife's disrespectful brief soon after it was filed, Husband only moved to strike Wife's brief in his own brief. We decline, at this late stage of the case, to strike Wife's brief. We also decline Husband's request for attorney's fees. Instead, we choose to move ahead and decide the issues on appeal.[3] However, we admonish Wife and her attorneys for the blatant disrespect shown to the Trial Judge in her brief. These comments went to the very line of what would necessitate additional action on our part even considering the delay in bringing this issue to the attention of this Court.

Turning to Wife's issues, we first address whether the Trial Court erred in declining Wife's request, made after trial but before entry of the final decree, to re-open proof in the matter stemming from Callie's serious incident. As pointed out by the Trial Court, this was a long and extensively litigated case. Trial took eleven days, over the course of months. The trial had to end at some point. The Trial Court's decision not to re-open the proof at Wife's request was reasonable and not an abuse of its discretion.

Even still, Wife is correct that she should be able to put on proof of Callie's health as it bears directly upon whether the parenting plan is in Callie's best interest. We disagree, however, that this meant the Trial Court was required to re-open the proof. Both parties submitted supplemental authority on this issue. Of particular note, Husband brought to our attention the case of *Bowen v. Wiseman*, No. M2017-00411-COA-R3-CV, 2018 WL 6992401 (Tenn. Ct. App. June 29, 2018), *no appl. perm. appeal filed*, a custody modification case in which this Court stated that a court may consider evidence toward best interest even if it occurred before entry of a previous order. We stated:

> *Res judicata* does not bar a respondent/parent opposing a residential parenting schedule modification from putting on countervailing proof

---

[3] In her reply brief, Wife argues that Husband's brief fails to comply with Tenn. R. App. P. 27 and Rule 6 of the Rules of the Tennessee Court of Appeals for failure to support certain assertions with citations to the record, and that we should disregard such assertions. For his part, Husband argues that Wife failed to articulate her issues in such a way as to enable our review. We reject both parties' tangential arguments about the imperfections in each other's briefs, and get on with deciding this appeal.

-25-

relevant to the best-interest analysis concerning the petitioner/parent's history of bad behavior just because that behavior took place before the entry of the last parenting plan. To hold otherwise would elevate the court's interest in finality over the best interest of the child. In *Teutken v. Teutken*, the Tennessee Supreme Court expressly stated that the best interest of the child comes before the court's interest in promoting finality in child custody matters, stating as follows:

> Although an important factor, the need to promote finality is not the prevailing concern in resolving child-related matters. Rather, the prevailing concern is ensuring that the best interests of the child are protected. *See* Tenn. Code Ann. § 36-6-106(a); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (holding that child custody awards are always subject to modification to ensure that the best interests of the child are protected).

*Teutken v. Teutken*, 320 S.W.3d 262, 272 (Tenn. 2010).

Father avers that the trial court was not permitted to consider evidence concerning any events which took place before the entry of the January 2013 Agreed Order. However, we hold that the trial court was permitted to consider all evidence relevant to the best-interest factors. *See* Tenn. Code Ann. § 36-6-106(a)(1)-(15).

*Bowen*, 2018 WL 6992401, at *10-11.

As this Court has discussed, our usual dedication to the principle of finality is lessened where the subject matter is a child's best interest. If res judicata barred Wife from raising Callie's serious incident in a subsequent modification petition, and the Trial Court declined to hear her proof previously, there would be a "dead zone" between trial and entry of the final order in which evidence relevant to a material change of circumstance and the child's best interest could arise but never could be considered by any court. "[A] party who has knowledge of material facts or reasonably should have known of them before entry of a final order, but does not bring them to the attention of the court, cannot use those facts in a later modification proceeding to show a material change of circumstances." *Costley v. Benjamin*, No. M2004-00375-COA-R3-CV, 2005 WL 1950114, at *6 (Tenn. Ct. App. Aug. 12, 2005), *no appl. perm. appeal filed*. In this case, Wife *did* bring the facts to the attention of the Trial Court—the Trial Court just declined to hear them. The Trial Court's decision was not unreasonable, as we have discussed. However, Wife is not foreclosed from bringing the evidence at issue forward in the future. We hold that, while

the Trial Court did not abuse its discretion, this evidence of Callie's serious incident is not barred by res judicata and may be part of a future petition to modify custody.

The next issue we address is whether the Trial Court erred in its division of assets. Under the umbrella of this issue, Wife raises several sub-arguments which we address in turn. We begin by reviewing the pertinent law. In relevant part, Tenn. Code Ann. § 36-4-121(c) (2017)[4] provides:

> (c) In making equitable division of marital property, the court shall consider all relevant factors including:
> (1) The duration of the marriage;
> (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
> (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
> (4) The relative ability of each party for future acquisitions of capital assets and income;
> (5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;
> (B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.
> (6) The value of the separate property of each party;
> (7) The estate of each party at the time of the marriage;
> (8) The economic circumstances of each party at the time the division of property is to become effective;
> (9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;
> (10) In determining the value of an interest in a closely held business or similar asset, all relevant evidence, including valuation methods typically used with regard to such assets without regard to whether the sale of the asset

---

[4] The statute has been amended since the complaint was filed. The amendment is not outcome-determinative.

is reasonably foreseeable. Depending on the characteristics of the asset, such considerations could include, but would not be limited to, a lack of marketability discount, a discount for lack of control, and a control premium, if any should be relevant and supported by the evidence;

(11) The amount of social security benefits available to each spouse; and

(12) Such other factors as are necessary to consider the equities between the parties.

A trial court has wide discretion in dividing the interest of the parties in marital property. *Barnhill v. Barnhill*, 826 S.W.2d 443, 449 (Tenn. Ct. App. 1991). As noted by this Court in *King v. King*, when dividing marital property:

The trial court's goal in every divorce case is to divide the parties' marital estate in a just and equitable manner. The division of the estate is not rendered inequitable simply because it is not mathematically equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988), or because each party did not receive a share of every item of marital property. *Brown v. Brown*, 913 S.W.2d [163,] at 168 [(Tenn. Ct. App. 1994)]. . . . In the final analysis, the justness of a particular division of the marital property and allocation of marital debt depends on its final results. *See Thompson v. Thompson*, 797 S.W.2d 599, 604 (Tenn. App. 1990).

*King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (quoting *Roseberry v. Roseberry*, No. 03A01-9706-CH-00237, 1998 WL 47944, at *4 (Tenn. Ct. App. Feb. 9, 1998), *no appl. perm. appeal filed*). "[O]ne party's dissipation of assets can be considered in formulating a property division that is equitable." *Hulshof v. Hulshof,* No. 01A01-9806-CH-00339, 1999 WL 767807, at *5 (Tenn. Ct. App. Sept. 29, 1999), *no appl. perm. appeal filed.* Tenn. Code Ann. § 36-4-121(c)(5)(2017) specifically requires the court to consider "[t]he contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property . . . " in making an equitable distribution. The party alleging that marital assets have been dissipated "carries the initial burden of production and the burden of persuasion at trial." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010). Once a party has established a prima facie case that the opposing party has dissipated marital assets, the burden then "'shifts to the party who spent the money to produce evidence to show that the expenditures were appropriate.'" *Trezevant v. Trezevant*, 568 S.W.3d 595, 617 (Tenn. Ct. App. 2018) (quoting *Watson v. Watson*, 309 S.W.3d 483, 491 (Tenn. Ct. App. 2009)). As our Supreme Court has instructed regarding dissipation:

Dissipation of marital property occurs when one spouse wastes marital property and thereby reduces the marital property available for equitable

distribution. *See Altman v. Altman*, 181 S.W.3d 676, 681-82 (Tenn. Ct. App. 2005), *perm. to app. denied*, (Tenn. Oct. 31, 2005). Dissipation "typically refers to the use of funds after a marriage is irretrievably broken," *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006), is made for a purpose unrelated to the marriage, and is often intended to "hide, deplete, or divert" marital property. *Altman*, 181 S.W.3d at 681-82. In determining whether dissipation has occurred, trial courts must distinguish between dissipation and discretionary spending. *Burden*, 250 S.W.3d at 919-20; 24 Am.Jur.2d Divorce and Separation § 526 (2009). Discretionary spending might be ill-advised, but unlike dissipation, discretionary spending is typical of the parties' expenditures throughout the course of the marriage. *Burden*, 250 S.W.3d at 919-20.

*Larsen-Ball*, 301 S.W.3d at 235.

Wife argues that the Trial Court erred in finding that Husband's spending $88,907 of marital money during the pendency of the divorce to pay college expenses for an adult child of a prior marriage when adequate funds were available in a 529 plan for that child was not dissipation. Wife states that "the taking was intentional/purposeful conduct that had the effect of reducing the funds available for equitable distribution. The Appellate Record is devoid of any proof showing such expenditure was the norm during the marriage; and in light of the earmarked funds in the 529 Plan there is not another credible explanation for Husband's action." In response, Husband argues that if even college spending could be considered dissipation, Wife was unharmed by Husband's decisions as the parties' primary jointly-held account was divided in a relatively equal manner. While a party could, in theory, dissipate marital funds by shunting them into a special education account for the underhanded purpose of reducing the marital estate, the Trial Court found no such scheme at work here. Rather, the evidence is fairly abundant that Father traditionally has taken a keen interest in the private education of all of his children. Moreover, we, like the Trial Court, find it somewhat problematic to classify a parent's investment in his children's education as wasteful, even if the offspring at issue are from a prior marriage and there are other funds available. We find no abuse of discretion by the Trial Court in its decision that Husband's expenditures on the higher education of his children from a prior marriage does not constitute dissipation.

Wife argues further that the Trial Court erred in finding that she was not entitled to any portion of the $127,522 in cash Husband withdrew from a joint bank account during the pendency of this divorce for which he made no accounting. Wife states that "Husband never produced any receipts or other documentation of what happened to the $127,522 that he withdrew from the parties' joint checking account," and she was stymied in discovery when the Trial Court quashed her subpoena. In response, Husband states: "[Wife] never

filed a petition for contempt for [Husband]'s alleged violation of the statutory injunction. This issue was, therefore, not litigated in the trial court." Indeed, Wife is incorrect in her attempted burden-shifting. If the funds are not accounted for, they are just that. Wife never proved that Husband's expenditures were for a purpose contrary to the marriage.

Continuing her arguments under this issue, Wife contends that the Trial Court erred in finding that it could not hear any updated evidence regarding the value of assets after entry of the final decree because the parties stipulated values at the inception of the trial. Wife states that "[b]y the time the Trial Court entered the final decree, the stipulated values were stale; b. The Trial Court did not uniformly enforce the stipulation; c. The Trial Court's actions frustrated the purpose of the stipulation; and d. Husband was unjustly enriched by the Trial Court's refusal to modify the final decree with more current asset values." In particular, Wife takes issue with the Trial Court having ultimately found Husband's interest in BBS at $0, rather than $267,000 as it found in its order of dismissal. Husband responds: "[Wife] did not file a pleading asking that the stipulation be modified for over a year after the stipulation was agreed upon. Instead, she waited for the trial court to issue its Memorandum and Final Decree of Divorce to determine if the ruling was to her liking." Indeed, a party may not stipulate to certain facts, await a result, incur an adverse result, and then seek to modify the stipulation.

In addition, we believe Wife has misinterpreted the Trial Court's treatment of Husband's $267,000 marital increase in interest in BBS. In its memorandum opinion, the Trial Court stated: "[Wife] argued that the value of [Husband]'s equity interest in Bass Berry & Sims had increased by $267,000 during the parties' marriage. The Court determined, however, that because there was no proof that either party substantially contributed to the increased value of his interest, any increase is his separate property … the value of separate property is one of the relevant factors the Court must consider when dividing the marital estate." The Trial Court later found: "[Husband]'s equity interest in Bass Berry & Sims has no monetary value … he will receive nothing if he retires or otherwise withdraws his membership in the firm … he would receive a cash payout in accordance with his capital account only when Bass Berry & Sims is sold or dissolved. Presently, his capital account has a negative value, and there is no evidence that Bass Berry & Sims will be sold or otherwise dissolved in the foreseeable future."

In our view, these findings are consistent with the evidence. Based upon Husband's percentage interest in BBS and BBS's equity at the relevant time, there was an increase of $267,000 in Husband's interest in BBS over the course of the marriage. The question was how to characterize that interest and whether that interest could realistically be converted into cash. We fail to see any discrepancy in the Trial Court's application of stipulations.

As a final sub-argument on this issue of property division, Wife argues that the Trial Court erred by finding age a more important factor than the relative ability of each party for future acquisitions of capital assets and income. Wife argues that "[w]hile Wife agrees that she should be able to earn income and acquire assets in the future, her ability to do so will pale in comparison to that of [Husband], who earns approximately eleven (11) times what she does. (The Trial Court found [Husband]'s 2017 income to [sic] was "nearly $1.7 million" and [Wife]'s was "approximately $153,000)." Husband responds, stating that the Trial Court "took into account a wide range of considerations in deciding the division of assets, but never simply held or found that age is more important than income."

Based upon our careful review of the record, we agree with Wife that the Trial Court placed an inordinate focus on the age disparity between the parties. The much more impactful disparity between the parties is their capacity to acquire future assets or income, which implicates statutory factor (4). Husband is a partner at BBS and earns well over a million dollars a year. Wife is a staff attorney who made considerable career sacrifices during the marriage. She earns far less than Husband. Even if Husband retires at age 70, he is much better positioned to earn large sums of money until then than Wife. Indeed, if Wife earns some $192,000 as she stipulated she can, she would still come out behind given the disparity with Husband. From the evidence before the Trial Court, Husband will earn millions of dollars more than Wife if they both work to age 70.

This clearly excessive emphasis on age rather than earning capacity is, under the facts of this case, reversible error by the Trial Court. We, therefore, vacate the judgment of the Trial Court as to the property division, and remand for a fresh division of the marital estate. On remand, the Trial Court is to arrive at a division that is as close to 50/50 as possible. This Court finds that such a division is an equitable overall division when considering all the relevant factors and evidence presented in this case. To be sure, there is nothing inherently equitable about a 50/50 split; in some cases, a heavily imbalanced division may be equitable. This is not such a case. Wife requests that this case be assigned to a new Judge on remand, one who is "less busy." The request is denied.

We next address whether the Trial Court erred in its award of child support. Wife argues, first, that the Trial Court erred by finding that she failed to prove a need for an upward deviation in Husband's basic child support obligation. Wife states further that the Trial Court erred by finding Husband did not have to continue contributing to already established 529 plans for the children of this marriage. As a last sub-argument on this issue, Wife argues that the Trial Court erred in declining to order Husband to pay 100% of the uncovered medical expenses for the parties' children—the Trial Court ordered him to pay 90%, instead.

-31-

Child support obligations are governed by the Child Support Guidelines, which are promulgated by the Tennessee Department of Human Services in accordance with Tenn. Code Ann. § 36-5-101(e). A trial court may in its discretion deviate from the support required by the Child Support Guidelines. *State v. Wilson*, 132 S.W.3d 340, 343 (Tenn. 2004). Tenn. Code Ann. § 36-5-101(e)(1)(B) provides that "if the net income of the obligor exceeds ten thousand dollars ($ 10,000.00) per month, then the custodial parent must prove, by a preponderance of the evidence, that child support in excess of the amount provided for in the child support guidelines is reasonably necessary to provide for the needs of the minor child or children of the parties." Tenn. Code Ann. § 36-5-101(e)(1)(B)(2017). The Guidelines, as amended, attempt to "[e]nsure that, when parents live separately, the economic impact on the child is minimized while setting an accurate order based upon the ability to pay, and, to the extent that either parent enjoys a higher standard of living, the child shares in that higher standard[.]" Tenn. Comp. R. & Regs. 1240-02-04-.01(3)(e). This Court has discussed:

> Establishing a trust for educational purposes to benefit the child is a "discretionary mechanism" available to the trial court. *Bryan v. Leach*, 85 S.W.3d 136, 153 (Tenn. Ct. App. 2001); *Nash v. Mulle*, 846 S.W.2d 803, 806 (Tenn. 1993). Because deviations from the child support guidelines are discretionary, we review the trial court's decision to deviate upward for an abuse of discretion. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). An abuse of discretion occurs when the trial court deviates from the statutes or guidelines without an adequate evidentiary foundation. *State ex rel. Anderson v. Taylor*, No. M2001-02193-COA-R3-CV, 2003 WL 21480087, at *4 (Tenn. Ct. App. June 27, 2003).

*Halliday v. Halliday*, No. M2011-01892-COA-R3-CV, 2012 WL 7170479, at *10 (Tenn. Ct. App. Dec. 6, 2012), *Rule 11 perm. app. denied April 11, 2013*.

Wife argues that "[a] strict application of the Guidelines is not in the … children's best interest, would be unjust, and would significantly reduce the lifestyle to which the children have been accustomed. Father earns $1,708,698.00 a year (2017 tax returns) (Ex.100) and Mother earns $153,293.95 (2017)." Wife states further that "[Husband]'s income is about fourteen times greater, and the undisputed proof is that both parents' expenses for the children's needs for housing, food, transportation, clothing, and entertainment far exceed $3,200 per month because they can afford it and it is how they have supported their children during their entire marriage." Husband, meanwhile, states that he already pays more than the minimum under the Guidelines. He notes that he "was ordered by the trial court to pay the full cost of private school for both Callie and Andrew, as well as an additional $600 per month toward their extracurricular activities."

-32-

Wife is correct in that the children have enjoyed a well-off lifestyle. However, whether to award an additional upward deviation was within the Trial Court's discretion. The Trial Court made credibility determinations against Wife. The evidence in the record is not sufficient for us to ignore the Trial Court's credibility determinations. We do not find that the Trial Court abused its discretion in declining to order Wife's requested upward deviation.

With respect to the 529 plans, Wife argues that the Trial Court erred by not ordering Husband to fund them. Wife states that Husband's testimony about whether he would continue funding them was conditional, and he should be ordered to do so to ensure he does. Wife is correct in that Husband expressed some uncertainty about funding the plans going forward. However, Husband already has paid for the children's private secondary education and has already funded 529 accounts for the children. Based on this record, Husband has, historically, demonstrated a commitment to funding the private education of all of his children. While Husband expressed some uncertainty about the future, his record is clear that he supports the children's education. As found by the Trial Court, Wife failed to establish a need for an order requiring Husband to fund the 529 plans. We find no error by the Trial Court in that decision.

With regard to uncovered medical expenses, Wife argues that her being ordered to pay 10% instead of nothing has the effect of shifting "the financial burden of even more uncovered medical costs to Mother when the Trial Court ordered her to pay a pro-rata share based on an inflated income she has never earned." However, Wife stipulated that she is capable of earning upwards of $192,000 per year, and we decline to revisit that stipulation on appeal. Under the Child Support Guidelines, assigning Wife a 10% pro rata share of uncovered medical expenses is appropriate. Husband is still responsible for 90% of the expenses. On this and all other sub-arguments on this issue, we discern no abuse of discretion by the Trial Court.

The final issue we address is whether the Trial Court erred in declining to award Wife alimony in solido and in the amount and duration of its transitional alimony award to Wife. Wife argues the Trial Court "erred in failing to award Wife alimony *in solido* to adjust the division of the marital estate which had been depleted by Husband on his adult daughter and by Husband's unaccounted for withdrawals of $127,000." Wife states further: "Wife needs at least $18,198 per month to meet the expenses for herself and the children and this is the standard of living that she and the children have enjoyed." Wife states: "Increasing [Husband]'s alimony obligation to $7,000 per month is small change to [Husband] but would alleviate the financial burden to [Wife] and meaningfully impact the Wife's and children's lifestyle." In response, Husband states: "The trial court considered each and every factor set forth in Tenn. Code Ann. § 36-5-121(i) that controls the determination of alimony. Included in that consideration was the trial court's consideration

-33-

of §36-5-121(i)(12) which allows courts to consider '[s]uch other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.'"

As our Supreme Court has observed, trial courts have broad discretion "to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski*, 350 S.W.3d at 105. Alimony determinations are fact-driven and require a balance of many factors, and we do not tinker with a trial court's decision in this area absent an abuse of discretion. *Id.* Alimony in solido, lump-sum alimony, is a form of long-term support that is set on the date of the divorce decree and payable in a lump sum payment of cash or property or paid out in installments for a definite term. *Id.* at 108. Transitional alimony, the other type of alimony at issue, is appropriate when a court finds rehabilitation is unnecessary but the economically disadvantaged spouse requires financial assistance adjusting to the economic consequences of divorce. *Id.* at 109. Transitional alimony is not modifiable except for certain exceptions, such as when the parties agree it may be modified, the court provides for modification in the decree, or the recipient spouse resides with a third person. *Id.*

In determining whether to award alimony and, if so, its nature, amount, length, and manner of payment, courts consider the following statutory factors:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
(3) The duration of the marriage;
(4) The age and mental condition of each party;
(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
(7) The separate assets of each party, both real and personal, tangible and intangible;
(8) The provisions made with regard to the marital property, as defined in § 36-4-121;
(9) The standard of living of the parties established during the marriage;
(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and

tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (2017).

As stated above, the determination of spousal support was a discretionary one for the Trial Court. The Trial Court made detailed findings with respect to alimony. The evidence does not preponderate against these findings. This is especially so given the Trial Court's adverse credibility assessment against Wife. We are not at liberty to overturn that credibility assessment absent clear and convincing evidence to the contrary. We find no such evidence. Although Wife contends that the Trial Court wrongly considered the parties' period of separation leading up to the divorce, the Trial Court in fact acknowledged that this was a long-term marriage and made its determination accordingly. The Trial Court disbelieved Wife's claimed expenses and noted that Wife leaves the marriage with more than $4.4 million under the Trial Court's division of the marital estate. We discern no abuse of discretion in the Trial Court's award to Wife of $5,000 per month in transitional alimony for 48 months and in declining to award alimony in solido.

In summary, we vacate the Trial Court's division of the marital estate and remand for the Trial Court to arrive at a division that is as close to 50/50 as possible, that being an equitable overall division under the specific facts of this case. The Trial Court is to rely on evidence already contained in the record; no additional evidentiary hearing is to be conducted. Otherwise, we affirm the judgment of the Trial Court.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and vacated, in part, and this cause is remanded to the Trial Court for further proceedings consistent with this Opinion and collection of the costs below. The costs on appeal are assessed one-half against the Appellant, Julie C. W., and her surety, if any, and one-half against the Appellee, Frank Mitchell W., Jr.

s/ D. Michael Swiney
D. MICHAEL SWINEY, CHIEF JUDGE

-35-